(C. D. 534)

MARKS BROS., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided September 24, 1941)

*Strauss & Hedges* (*Eugene F. Blauvelt* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*John J. McDermott*, special attorney), for the defendant.
*Lamb & Lerch*, by *John G. Lerch* and *Kenneth G. Osborn*, appearing as *amicus curiae.*

Before BROWN, TILSON, and DALLINGER, Judges; BROWN, J., not participating

DALLINGER, Judge: This is a suit against the United States, arising at the port of New York, brought to recover certain customs duties alleged to have been improperly exacted on a particular importation consisting of glass articles. Duty was levied thereon at the rate of 60 per centum ad valorem under the provisions of paragraph 218 (f) of the Tariff Act of 1930 which read as follows:

(f) Table and kitchen articles and utensils, and all articles of every description not specially provided for, composed wholly or in chief value of glass, blown, or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted, gilded, ground (except such grinding as is necessary for fitting stoppers or for purposes other than ornamentation), painted, printed in any manner, sand-blasted, silvered, stained, or decorated or ornamented in any manner, whether filled or unfilled, or whether their contents be dutiable or free, 60 per centum ad valorem.

It is claimed that said articles are properly dutiable at the rate of $1.25 per thousand, or, alternatively, at 5 per centum ad valorem but not less than $1.50 per thousand under the provisions in paragraph 201 (b) of said act which reads as follows:

(b) All other brick, not specially provided for: Not glazed, enameled, painted, vitrified, ornamented, or decorated in any manner, $1.25 per thousand; if glazed, enameled, painted, vitrified, ornamented, or decorated in any manner, 5 per centum ad valorem, but not less than $1.50 per thousand.

In their brief filed herein counsel for the plaintiff specifically limit their claims to the following merchandise, to wit: on entry 813058 to the articles described as radium cinter, a sample of which was admitted in evidence as exhibit 1, and to the articles described in said entry as "tiles vertica," a sample of which was admitted in evidence as exhibit 2; and on entry 823116 to all of the merchandise described on said entry as "hollow glass brick," a sample of which was admitted in evidence as exhibit 3. As to the balance of the merchandise covered by either or both of said entries, no claim is made.

In addition to said samples, the plaintiff offered in evidence the testimony of three witnesses. The first, Nathan Marks, secretary and general manager of the plaintiff-corporation, who, after identifying the samples (exhibits 1, 2 and 3), testified that he had sold the merchandise so represented and had seen it used; that it was sold to parties desiring to erect walls of colored brick; that his company issued a catalog containing illustrations and descriptions of such glass brick, which catalog was admitted in evidence as illustrative exhibit A; that his company has sold articles similar to exhibits 1, 2, and 3 as glass brick and under no other name or designation; that his company has been handling such glass brick for the last 4 or 5 years; that he had seen articles like exhibits 1, 2, and 3 used by bricklayers throughout New York City; that said exhibits are not decorated, painted, enameled, vitrified, or ornamented in any manner; and that the color in said exhibits was in the original glass as manufactured.

On cross-examination the witness testified that he was engaged in the business of selling glass bricks for building purposes; that he had no experience in bricks of other types; that he had used articles like exhibits 1, 2, and 3 in the construction of interior wall partitions and fireplaces in a house in New York City; and that he had made no tests to determine the ability of such articles to withstand the press load of sudden shock or vibration.

On redirect examination the witness testified that materials like exhibits 1, 2, and 3, that were used by him in the construction of a house in New York City, were used in the same way that ordinary clay bricks were used in other houses, being cemented together with mortar cement.

On recross-examination the witness testified in part as follows:

By Mr. McDermott.

R. X Q. Do you mean to tell the court that articles like Exhibits 1, 2 and 3 were used in the identical same manner as the clay brick in the apartment house that you did put it in?—A. Yes.

R. X Q. That it was a part of the structural wall of the apartment house?—A. They were used in an interior wall.

R. X Q. But not in the supporting wall?—A. Not in the supporting wall.

R. X Q. Then they were used in a different manner than the clay brick?—A. They were used in the same manner as the clay brick.

R. X Q. The clay brick supported the load of the building?—A. No.

R. X Q. What supported the load?—A. The steel.

\*   \*   \*   \*   \*   \*   \*

R. X Q. Isn't it correct that articles like Exhibits 1, 2 and 3 were used in a panel effect in that building; that they carried no weight at all; that the weight was carried by the steel structure?—

\*   \*   \*   \*   \*   \*   \*

A. Well, the weight of the building itself was carried by the steel structure, yes.

\*   \*   \*   \*   \*   \*   \*

Redirect examination by Mr. Blauvelt.

R. Q. That is true, isn't it, wherever a building has a steel frame, even though the exterior walls of that building are made of clay bricks?—A. Yes, sir.

The second plaintiff's witness, Bernard R. Glaser, a salesman, estimator, and designer in the employ of the plaintiff-corporation, testified that he had sold merchandise similar to exhibits 1, 2, and 3 and had seen the same used; that he had sold the same to masons' material people; that he had personally supervised the construction of an apartment house located at Kings Highway and East 36th Street, Brooklyn, in which articles like exhibit 2 were actually used; a photograph showing the said use being admitted in evidence as illustrative exhibit B.

The witness then proceeded to produce other photographs of buildings in the construction of which glass bricks were used similar to those represented herein by exhibits 1, 2, and 3, which photographs were admitted in evidence as illustrative exhibits C, D, E, and F.

The witness then testified that he had sold merchandise similar to exhibits 1, 2, and 3 as glass brick and under no other designation; that his company's catalog (illustrative exhibit A) was distributed to the trade and to architects; and that glass bricks similar to exhibits 1, 2, and 3 were used on buildings by bricklayers and were set in regular mortar cement.

The third plaintiff's witness, Herman Timm, testified that he had been a bricklayer for the past 38 years in New York City; that during the last 3 or 4 years he had done considerable work with material like exhibits 1, 2, and 3; that he laid all kinds of brick including glass bricks like exhibits 1, 2, and 3; that in laying the said glass bricks

he used cement a little stiffer than that used in laying clay bricks; that he was a member of a bricklayers' union, Local No. 9; that the union has strict rules in regard to the kind of materials used by union bricklayers; that the said rules permit the use of all kinds of bricks, including glass bricks; that article 7 on page 19 of a certain booklet entitled "Trade Agreement between the Building Contractors' and Mason Builders' Association of Greater New York and Members of the Bricklayers', Masons' and Plasterers' International Union of America" (which booklet was admitted in evidence as plaintiff's illustrative exhibit G) expressly permits bricklayers to lay bricks of glass; and that as a bricklayer for the last 38 years he considered articles like exhibits 1, 2, and 3 to be bricks.

The Government offered in evidence the testimony of six witnesses, the first being Ralph I. Estreich, the United States examiner of merchandise at the port of New York who passed the instant importation. He produced a sample of the merchandise passed upon by this court in the case of *Structural Glass Corporation* v. *United States*, T. D. 46127, 63 Treas. Dec. 167, which was admitted in evidence as defendant's illustrative exhibit H.

The second Government witness, Stanley J. McGiveran, general manager of the Insulux Products Division of Owens-Illinois Glass Co., the main office of which company is at Toledo, Ohio, testified that he had charge of the manufacture and sale of glass blocks and insulators; that he had been familiar with articles like exhibits 1, 2, and 3 since 1933; that he had sold them at wholesale as glass blocks; that they were ordered by customers as glas blocks; that he had made tests of articles similar to exhibits 1, 2, and 3; that based upon his experience such articles were not capable of sustaining loads; that he had never tested glass blocks from this particular foreign manufacturer; that on several occasions people had called articles similar to said exhibits 1, 2, and 3 glass bricks; that in his opinion said exhibits were colored and decorated; that he had seen articles like said exhibits used in the same manner as those used in illustrative exhibit B; that in illustrative exhibits C and D articles like exhibits 1, 2, and 3 are used for the purpose of decoration, for the diffusion of light and for insulation against heat or cold; that an outside wall may be made of glass blocks but it must be in the form of a free-floating panel; and that glass blocks will carry their own load up to 20 or 25 feet.

On cross-examination the witness testified that exhibits 1, 2, and 3 are not glazed, enameled, painted or vitrified; that whatever ornamentation or decoration they possess took place while the glass was in the mold; and that the primary purpose of using glass blocks was not to take the place of other building material but for ornamentation and light transmission.

The third Government witness, Julian P. Staples, a qualified structural engineer and general manager of the Pittsburgh-Corning Co., testified that he had encountered articles like exhibits 1, 2, and 3 in competition with the products of his own company; that he had been familiar with such articles since 1932; that he had sold articles similar to exhibits 1, 2, and 3 in wholesale quantities throughout the United States under the name of glass blocks; that no glass blocks were ever used for real construction but only for ornamentation, light, or insulation; that they are never used to construct an outside wall the same as common bricks are used, for the reason that they are about 25 times more expensive than common clay bricks; that he concurred in the definition of a free-floating panel given by the previous witness; that exhibits 1 and 2 are plain and exhibit 3 is colored; and that exhibits 1, 2, and 3 are decorated glassware.

On cross-examination the witness testified that he recognized a certain catalog as having been issued by his company, which catalog was subsequently admitted in evidence as plaintiff's illustrative exhibit J. The witness then proceeded to testify in part as follows:

X. Q. That has certain pictures and illustrations of what you term as glass blocks, does it not, and the uses of them?—A. Yes.

X. Q. I direct your attention particularly to the fourth and fifth pages, which purport to be a representation of the Packaging Research Laboratory of the Owens-Illinois Glass Company, and ask you if the building there represented does not consist of a glass block wall entirely, around the whole building?—

\*       \*       \*       \*       \*       \*       \*

A. It does.

On redirect examination the witness testified that the building which he had marked X on illustrative exhibit J was erected with steel frames which carried the load of the structure, and that the function of the glass blocks was to provide closure, light, and insulation.

The fourth Government witness, Donald C. Burnham, manager of glass block sales of the Pittsburgh-Corning Co., testified that he was familiar with merchandise identical with that represented by exhibits 1, 2, and 3, having sold the same throughout the United States; that he had seen such articles used as a glass block panel on a store front; and that in his opinion exhibits 1, 2 and 3 were all decorated.

The fifth Government witness, Frank J. McNeil, eastern field manager of the Owens-Illinois Glass Co. since 1938, testified that he had had experience in selling bricks and building material of all kinds since 1911 in all parts of the United States, that he had handled glass in his own business for the last 11 years; that exhibits 1 and 3 were colored; and that exhibits 1, 2, and 3 were decorated glass blocks.

The sixth and last Government witness, Nathan Marks, who had formerly testified as a witness for the plaintiff, testified that he had charge of the advertisements of his firm; that he was familiar with a

certain advertisement appearing in a paper which was subsequently admitted in evidence as illustrative exhibit I, and that he personally paid for such advertisement.

On cross-examination the witness testified that the advertisement in question (illustrative exhibit I) was published in a trade magazine; and that illustrative exhibit J was only a portion of the advertisement.

On redirect examination he testified that illustrative exhibit I was published in the Glass Digest for May, 1938.

At this juncture the said page from the Glass Digest was admitted in evidence as defendant's illustrative exhibit K.

At the conclusion of the testimony counsel for the Government moved for a continuance, which motion was denied.

Upon this record counsel for the plaintiff in their brief filed herein call our attention to the fact that substantially the same issue as that here raised was passed upon by the First Division of this court in the case of *Structural Glass Corporation* v. *United States*, T. D. 46127, 63 Treas. Dec. 167, wherein certain glass bricks, assessed with duty at the rate of 50 per centum ad valorem under paragraph 230 (d) of the Tariff Act of 1930 for manufactures of glass not specially provided for, were claimed to be properly dutiable, as here, at the rate of $1.25 per thousand or at 5 per centum ad valorem but not less than $1.50 per thousand under the provisions of paragraph 201 (b) of said act. In sustaining the claim of the plaintiff, this court, among other things, said:

Mr. Johnson testified he had seen articles like exhibits 1 and 2· in actual construction, and "they are used in the place of an ordinary brick wall." He specified various buildings where he had seen them used and testified that the workmanship employed in erecting them is that of "an ordinary brick mason," and the cement used "is the same cement used on an ordinary brick wall"; * * *.

    *        *        *        *        *        *        *

Paragraph 201 (a) refers to brick of various materials and kinds. Admittedly the mind, when the word "brick" is mentioned, turns instantly to brick used for building purposes and ordinarily made of clay. The feasibility of using glass in the manufacture of brick for building or construction purposes of any kind would not occur to the ordinary mind as such manufacture is outside the beaten path.

In the issue involved in this case we are not concerned with the feasibility or advisability of using glass for brick purposes. The statute after specifying in subdivision (a) certain varieties of brick, which do not include glass brick, then refers in subdivision (b) to "all other brick, not specially provided for." This merchandise is glass brick of about the size of ordinary clay building brick and certainly falls within the provision for "all other brick not specially provided for." * * *.

In his concurring opinion, Judge McClelland, among other things said:

* * * I look upon it as a regrettable fact that the testimony upon which the issue must be determined was given by two witnesses called by the plaintiff corporation. * * *.

I have read and carefully considered paragraph 201, under which the plaintiff claims duty should have been assessed, and have very serious doubt as to whether the Congress intended to provide therein for so-called glass bricks.   *   *   *

\*        \*        \*        \*        \*        \*        \*

Under the rule of *ejusdem generis* I am strongly of the opinion that when paragraph 201 was framed and passed, Congress had no thought of glass bricks.   My doubt as to whether the protestant's claim is well founded is increased by reference to the definitions of lexicographers, from which I quote the following:

Encyclopedia Britannica, 14th Edition, 1929:

Brick is made of clay, a product of the breaking down by weather and other destructive agencies of ancient rocks of all kinds.

\*        \*        \*        \*        \*        \*        \*

In American practice a brick is a structural unit of burned clayey material, in the form of a rectangular block with the standard dimensions of 2¼-in. by 3¾-in. by 8-in.   Bricks of other sizes, of other materials, and other structure than solid except those of limited perforations have qualifying names as: Fire bricks, paving bricks, sand lime, chrome, magnesite, and silica bricks.

New International Encyclopedia, 2d edition, 1930:

Common bricks are made from clays or shales, usually of low grade and mostly of the red-burning character   *   *   *.

Knight's American Mechanical Dictionary, 1873:

Brick: A molded and burned block of tempered clay.

Century Dictionary and Encyclopedia, 1913:

Brick: A kind of artificial stone made (usually) of moistened and finely kneaded clay molded into rectangular blocks   *   *   *   and hardened by being burned in a kiln, or sometimes, especially in warm countries, being dried in the sun.

\*        \*        \*        \*        \*        \*        \*

Funk & Wagnalls' New Standard Dictionary, 1930:

Brick: (1) A molded block of clay, either burned or sun dried.

These definitions emphasize my doubt as to whether the so-called glass bricks are the bricks of commerce.

While it is true that the case of *Structural Glass Corporation* v. *United States, supra,* was not appealed and has not been specifically overruled, we are much impressed by the appellate court's decision in the case of *Hampton, Jr. & Co.* v. *United States*, 12 Ct. Cust. Appls., 490, T. D. 40695, in which that court, in a unanimous decision, held that certain asbestos shingles were not free of duty under the *eo nomine* provision for shingles in paragraph 1660 of the Tariff Act of 1922, as claimed by the plaintiff, but were properly dutiable at the rate of 25 per centum ad valorem under paragraph 1401 of said act for manufactures in chief value of asbestos, as assessed by the collector.   In its decision the court said:

*   *   *   The evidence before the court below, on the part of the importers, shows, we think it can be fairly stated, that the merchandise is known commonly among those who deal in and with it as "asbestos shingles."   *   *   *.   We are unable to see the relevancy of such testimony.   The question involved was whether the articles of importation were, or were not, shingles, as commonly so known. To prove that an article is commonly known as an asbestos shingle does not at all prove that it is commonly known as a shingle.

In order to have their goods admitted free, the appellants must establish that they are "shingles."—Two hundred Chests of Tea (9 Wheat. 428 [437].)   Or importer might establish that the word "shingles" had a well-known, uniform, and general trade meaning, and that it included the merchandise in question.— *Knauth* v. *United States* (1 Ct. Cust. Appls. 422; T. D. 31499).

When attempting to interpret terms used by Congress in tariff laws, the court may call to its aid, as helps to interpretation, definitions given by lexicographers of the words in question. This is the well-established rule. · When we look to the works of modern 'lexicographers, the word "shingle" is defined as follows:

*Webster's, 1924:*
A piece of wood sawed or rived thin and small, with one end thinner than the other, for covering roofs, etc., the thick ends of one row overlapping the thin ends of the next.

*Funk & Wagnalls, 1923:*
A thin piece of wood, usually 18 inches long and 4 or more wide, half an inch thick at one end, and tapering to less than an eighth of an inch at the other end, used like a tile or slate in covering roofs and sometimes the sides of buildings, the thick ends of one course lapping over the thin ends of the rows next below. In computation, a width of 4 inches is considered one shingle.

*Century, 1911:*
A thin piece of wood having parallel sides and being thicker at one end than the other, used like a tile or a slate in covering the sides and roofs of houses; a wooden tile. In the United States shingles are usually about 6 inches in width and 18 inches long, and are laid with one-third of their length to the weather—that is, with 12 inches of cover and 6 inches of lap.

*Murray's, 1912:*
A thin piece of wood having parallel sides and one end thicker than the other, used as a house-tile.

*Worcester's 1908:*
An oblong piece of wood, thinner at one end than at the other, used instead of slates or tiles for covering roofs.

*Webster's Imperial, 1924:*
A thin piece of wood, having parallel sides, and thicker at one end than the other, commonly used as a roof covering, like a slate or tile. Shingles are laid with one-third of their lengths to the weather. They are usually 18 inches long, and so have 6 inches of margin.

It must be apparent, therefore, that lexicographers agree that the common meaning of the word "shingle" imports a certain manufacture of wood.

\* \* \* \* \* \* \*

Manifestly, during all our tariff history, up until the time of the consideration and passage of the tariff act of 1922, shingles were treated and considered by Congress as manufactures of wood. A distinction once made by Congress as to tariff commodities will be presumed to continue in the absence of anything showing a contrary legislative intention.—*United States* v. *Davies Co.* (11 Ct. Cust. Appls. 392; T. D. 39317.)

\* \* \* \* \* \* \*

Counsel for appellants, in his very able and exhaustive argument, contends that the word "shingles" is a generic term and that anything which might be denominated a species of shingle would be included within such designation and argues therefrom that if the article were called a shingle, irrespective of any adjectival modification of it, and irrespective of the material of which it was composed, it would be properly included within the free list provision here. In support of this, he cites several authorities, which will be briefly reviewed. \* \* \*

An examination of these cases discloses that in each and every instance the proof offered showed that the article which was sought to be admitted as free was commonly known, or commercially known, under the same name as the item in the free list or claimed class, and in each and every case had exactly the same qualities and characteristics; but the decisive factor in each of such cases was that the articles were known by the same name. This, in our judgment, is the controlling factor in the case at bar.

The case at bar seems to be on all fours with T. D. 26091, where the articles of import in question were rubber sponges. They were known to the trade as rubber sponges, but the court held that, not being the natural growth known to

the general public, and to lexicographers, as sponges, the mere arbitrary designation of them under the name of "sponge" could not make them such within the meaning of the tariff act. The very able opinion of Sharretts, General Appraiser, in that case, was affirmed in *Smith* v. *United States* (143 Fed.' 691). To a like effect is *United States* v. *Walter* (4 Ct. Cust. Appls. 95; T. D. 33371), where the article in question was shown to be commercially known as "ladder tape," and therefore was sought to be included within the section of the law covering "tapes." The court held that its mere commercial designation as "ladder tape" did not make it a tape within the ordinary meaning of that term.

And that must necessarily be the rule here. To hold that Congress intended to admit free of duty any article which could be used for a roof covering, and which might be called by the manufacturer a "shingle," would be to hold that Congress intended to admit free of duty manufactures of copper, zinc, metal, slate, stone, terra cotta, asbestos, asphaltum, rubberoid, or any other material of any kind which might be used for a similar purpose as wooden shingles, and which might arbitrarily be called a certain kind of shingle.

And so, in the instant case, it is not reasonable to suppose that Congress intended to admit free of duty every article which may be used in the construction of a wall of a building and which may be called "brick" by the manufacturer or seller thereof.

A somewhat analogous case is that of *G. Borgfeldt Corp.* v. *United States*, T. D. 48585, 70 Treas. Dec. 485, in which this court had before it the question of the dutiable classification of certain salad forks composed wholly of wood. They had been assessed with duty at the rate of 2 cents each and 45 per centum ad valorem under the provision in paragraph 355 of the metal schedule of the Tariff Act of 1930 for forks. Although they were unquestionably forks in form and shape, they were nevertheless held to be excluded from paragraph 355 and were classified as dutiable under paragraph 412 of said act as manufactures of wood not specially provided for. Note, also, *Carson, Pirie, Scott & Co.* v. *United States*, Abstract 2788, 51 Treas. Dec. 1203, and *R. Kohara & Co., Inc.* v. *United States*, T. D. 47777, 68 Treas. Dec. 14.

Furthermore we are fortified in our conviction that Congress could never have intended that the instant merchandise should be included within the purview of paragraph 201 (b) of the Tariff Act of 1930, when we read the following provision in the trade agreement between the United States and Czechoslovakia, promulgated in T. D. 49458, 73 Treas. Dec. 454:

| Tariff Act of 1930, paragraph | Description of articles | Rate of duty |
|---|---|---|
| * * * | * * * | * * * |
| 230 (d) | All glass and manufactures of glass, or of which glass is the component of chief value, except broken glass or glass waste fit only for remanufacture, not specially provided for: | |
| | Pressed building blocks or bricks, crystal color_____ | 40% ad val. |
| | Other_____ | 50% ad val. |

It is obvious that where the President acts under authority of the Trade Agreement Act, as where he acts under authority of section 336 of the Tariff Act of 1930, his action is merely an extension of the legislative process (*United States* v. *George S. Bush & Co., Inc.*, 310 U. S. 371) and thus reflects the Congressional will in the premises. And that legislative purpose applies whether the articles in question are called glass bricks or glass blocks. Under either designation they are now provided for *eo nomine* in said paragraph 230 (d), as modified by said trade agreement. Consequently, if the present shipment had been made after March 15, 1938, instead of prior to that date, there could have arisen no question as to the correct tariff classification thereof under said paragraph 230 (d) as so modified. Inasmuch as we believe the latter provision to be the only one applicable to said merchandise, and in view of the fact that it was not invoked by the protest or by amendment thereto, it follows that the collector's decision classifying the articles under said paragraph 218 (f), although erroneous, must nevertheless stand. All claims of the plaintiff are therefore overruled without affirming the decision of the collector.

Judgment will be rendered accordingly.